**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

**STEEL DYNAMICS COLUMBUS, LLC**                                    **PLAINTIFF**

**V.**                                                          **NO. 1:14-CV-124-DMB-DAS**

**ALTECH ENVIRONMENT USA CORP.**                                   **DEFENDANT**

**MEMORANDUM OPINION**

In August 2010, Steel Dynamics Columbus, LLC (under its former name, Severstal

Columbus, LLC),[1] contracted with Altech Environment USA Corp. to purchase two continuous

emissions monitoring units ("CEMS") for its steel plant in Columbus, Mississippi. The CEMS,

installed at Steel's plant in 2011, were required by the Mississippi Department of Environmental

Quality ("MDEQ") under the Title V permit issued to Steel. After experiencing multiple operating

issues with the CEMS over the course of three years, Steel commenced this action against Altech,

alleging the CEMS were defective. Steel seeks to recover from Altech damages for (1) the cost of

the CEMS; (2) the costs incurred in trying to make the CEMS work; (3) a fine imposed by MDEQ;

and (4) attorney's fees.

The Court held a three-day bench trial on Steel's claims for negligence, breach of contract,

breach of warranties, and contractual indemnification. At the bench trial, after Steel's case in chief,

the Court granted Altech's motion for a judgment on partial findings as to Steel's contractual

indemnity claim only. After the presentation of all evidence at trial, the Court took under

advisement Altech's renewed motion for a judgment on Steel's remaining claims. Upon

consideration of the trial evidence and the applicable law, the Court issues this memorandum opinion

---

[1] After Severstal filed this action and Altech removed the action to this Court, Severstal changed its name to Steel
Dynamics Columbus, LLC. On October 2, 2014, Severstal filed an unopposed motion to amend the style of this case to
reflect its new name, which United States Magistrate Judge David A. Sanders granted on October 14, 2014. Doc. #11;
Doc. #12. For ease of reference, this opinion will refer to the plaintiff at all times as "Steel."

as its ultimate findings of fact and conclusions of law.

# I
## Procedural History

On June 30, 2014, Steel filed this action against Altech in the Circuit Court of Lowndes County, Mississippi. Doc. #2. On August 4, 2014, Altech removed the case to this Court based on 28 U.S.C. § 1332.[2] Doc. #1 at ¶ 5. On October 14, 2014, Steel filed an amended complaint, asserting claims for breach of contract, breach of implied warranties, breach of express warranty, negligence, and contractual indemnification.[3] Doc. #13 at ¶¶ 22–25, 36–39.

On November 6, 2015, Altech filed a "Motion for Partial Summary Judgment on the Issue of Contractual Limitation of Remedies." Doc. #49. Though denying liability, Altech limited its motion to "how … provisions [in the parties' purchase contract] limit recoverable damages." Doc. #50 at 2. The Court denied Altech's motion without prejudice, concluding that ruling on only the issue of damages before a trial in which liability would be contested would be inefficient. Doc. #85 at 2 n.5, 3. The Court further stated that it preferred to consider the issue of damages in view of all facts to be presented at the bench trial[4] rather than just on the motion record. *Id.*

The Court held a bench trial from June 20, 2016, to June 23, 2016. At the close of Steel's case in chief, Altech moved for a judgment on partial findings on all of Steel's claims, which the Court granted only as to Steel's contractual indemnity claim.[5] At the close of Altech's case, Steel

---

[2] On May 31, 2016, and on June 7, 2016, the Court ordered Altech to show cause why this case should not be dismissed due to the absence of complete diversity under 28 U.S.C. § 1332. Doc. #73; Doc. #75. In response, on June 3, 2016, and June 8, 2016, Altech filed motions for leave to amend the jurisdictional allegations of its notice of removal. Doc. #74; Doc. #76. Because Altech attached to its second motion to amend evidence that this Court has jurisdiction over this case under 28 U.S.C. § 1332(a)(2), the Court granted Altech leave to amend its removal notice. Doc. #81. Altech filed a supplement to its notice of removal on June 16, 2016. Doc. #84.

[3] In the amended complaint, Steel's breach of contract claim is titled, "Breach of Contract/Contractual Indemnification," consisting of a contractual warranty and a contractual indemnity claim. Doc. #13 at ¶ 24.

[4] Steel never demanded a jury trial in this Court or in state court pre-removal.

[5] Regarding its contractual indemnity claim, Steel offered no evidence of (1) an allegation of property damage or personal or bodily injury; (2) any claim, loss, damage, or expense relating to such damage or injury; or (3) any manifest

declined to present a rebuttal case, and Altech re-urged its motion for judgment as to Steel's remaining claims. The Court took Altech's re-urged motion under advisement and ordered that the record be left open for seven days following trial. After the close of the record, Steel and Altech filed proposed findings of fact and conclusions of law on October 21, 2016. Doc. #96; Doc. #97.

## II
## Factual Findings

Steel operates a steel plant in Columbus, Mississippi, that melts scrap metal in an electric arc furnace. Tr. at 45, 90, 93.[6] The process releases pollutants regulated by Title V of the Clean Air Act. *Id.* at 94.

MDEQ issued Steel a Title V permit which, among other things, required Steel to install two CEMS. CEMS provide continuous data on the level of monitored pollutants in industrial emissions. Steel's Title V permit required the installation of the CEMS to monitor levels of four regulated pollutants—Nitrogen Oxides ($NO_x$), Carbon Monoxide (CO), Volatile Organic Compounds (VOCs), and Sulfur Dioxide ($SO_2$). Ex. P-1 at §§ 3.B.12–B.19.

### A. Altech Proposal

In May 2010, Steel, which had no experience with CEMS, solicited bids to purchase the CEMS required by MDEQ. Tr. at 96, 307–08. Altech, an Illinois provider of environmental monitoring systems, responded with a written proposal dated August 10, 2010. Ex. P-2.

Altech's proposal specified that Altech would supply CEMS that would monitor the

---

intent of the parties that the relevant indemnity provision would be so broad as to include the particular fine levied by MDEQ in this case. Without such facts, the Court could not conclude that Steel's alleged damages were covered by the relevant indemnity provisions at issue. The Court rejected Steel's sole argument—that all regulatory penalties under the Clean Air Act constitute a third party claim for personal injury and property damage. Tr. at 353. Had the Court not dismissed the contractual indemnity claim at trial, it would not have survived. The indemnity provisions require a finding of Altech's negligence and, as explained below, Steel's negligence claim fails.

[6] The trial transcript, Doc. #94, will be cited as "Tr."

pollutants regulated under Steel's Title V permit. *Id.* at 28–30, 40.[7] The proposal included a "DAS" computer, which would be pre-loaded with software to operate CEMS and would be necessary to receive usable information from the CEMS.[8] *Id.* at 29. The concentration ranges within which the CEMS would measure the regulated pollutants were to be set "as required." *Id.* at 28. As proposed, Altech represented that its CEMS would be "very well suited to monitoring emissions on arc furnaces." *Id.* at 23.

Under Altech's proposal, Altech would begin a "7-Day Drift Test" on the CEMS within five to seven days after "Equipment Startup" and, within a year after that, a more extensive "Relative Accuracy Test Audit" ("RATA") required by Steel's Title V permit. *Id.* at 41, 45, 49; Tr. at 526. The proposal included a one year maintenance contract, which included quarterly maintenance, as well as support services for startup, RATA testing, and "regulatory approval." Ex. P-2 at 29–30, 46.

The proposal also specified installation and maintenance requirements to be met by Steel and Altech. Regarding installation, the CEMS were to be mounted on a wall in a temperature-controlled room provided by Steel. *Id.* at 26, 41. Regarding maintenance, the proposal specified quarterly, semi-annually, and yearly maintenance, with the first year of maintenance to be performed by Altech under a proposed quarterly maintenance contract. *Id.* at 45. Every quarter, the CEMS were to undergo a performance test known as a "Calibration Gas Audit" and preventative maintenance, including servicing filters in the probe assembly.[9] Every year, the CEMS were to undergo a RATA. *Id.*

---

[7] Citations to pages of trial exhibits will generally be to the bates numbers on the exhibits.

[8] If the computer is inoperable, the CEMS cannot work properly. Tr. at 600.

[9] The CEMS operating manual specifies quarterly filter service. Ex. D-7 at 21272. Yet, an Altech technical support manager, Mark Chamberlin, twice testified that he "believe[ed]" that the manual specifies a *monthly* "filter check." Tr. at 394, 431–32. In this regard, Chamberlin's testimony is incredible to the extent inconsistent with the manual, which Chamberlin testified contained the relevant maintenance requirements.

## B. CEMS Purchase

On August 17, 2010, Steel issued a purchase order to Altech in the amount of $447,610.20 for two CEMS. Ex. P-3. The purchase order, which referred to Altech's proposal both by its identifying number and by specific numbered items, included a one year quarterly maintenance contract, a DAS computer with CEMLink5™ software from Contec, and a quality assurance plan for regulatory approval. *Id.*; Ex. P-2 at 28–30. When Steel ordered the two CEMS, "[Altech] understood that [Steel] intended to use the CEMS units to monitor emissions [from its steel plant] in compliance with the Title V Permit that MDEQ issued to [Steel]." Doc. #86 at § 9.a.(5), (6).

The undated "Goods and Services: Terms and Conditions of Purchase" ("Terms") include two sections relating to liability.[10] One section provides for an express warranty, and the other disclaims all implied warranties. Ex. P-4 at § 14. As relevant here, the Terms warrant that the CEMS "(i) shall be of good quality and free from defects, latent and patent, in design, materials and workmanship; [and] … shall be suitable and sufficient for their specified purpose." *Id.* The Terms also state that "THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR AN INTENDED PURPOSE." *Id.*

The Terms include two sections pertaining to remedies. One limits Steel's recourse for breach of the express warranty to repair and/or replacement of the CEMS at Altech's option.[11] *Id.*

---

[10] The parties do not dispute that this document represents an enforceable agreement. Altech's proposal references "Altech's standard terms and conditions." Ex. P-2 at 27, 31. However, it appears the Terms may have resulted from some negotiations of the standard terms and conditions.

[11] "If Supplier breaches its warranty obligations …, Supplier shall, at its option, repair and/or replace (FOB Jobsite) any of the Goods which breach this Warranty if written notice of such breach is given within twelve (12) months after start-up or eighteen (18) months after delivery, whichever occurs first." Ex. P-4 at § 14. Steel accepted the notice period as set forth in the Terms. Doc. #78 at 14. However, a longer notice period of the earlier of twenty-four months after startup or thirty months after delivery is specified in the proposal. Ex. P-2 at 31. The purchase order referenced the proposal and, consistent with the longer notice period in the proposal, Altech notified Steel in December of 2013 that its warranties had expired as calculated by two years from alleged startup dates. Ex. P-3 at 1; Ex. P-8 at 25751; Tr. at 178–79. Nevertheless, the length of the notice period in the express warranty is of no consequence here because, as explained

The other contains two clauses limiting Steel's recoverable damages—one limits all damages (except for indemnity) to the CEMS purchase price, and the other precludes all incidental and consequential damages.[12]  *Id.* at § 27.

### C.  CEMS Operating History

The first CEMS was installed between January 25 and January 27, 2011, with Altech supplying the DAS computer loaded with software.  Ex. P-9 at 1; Tr. at 479, 551.  In June 2011, Altech prepared specifically for Steel an operating manual setting forth maintenance requirements for CEMS.  Tr. at 394; Ex. D-7 at 21253; Ex. P-2 at 21.

The second CEMS was installed on July 22.  Ex. P-9 at 13; Tr. at 496.  Both of the installed CEMS included the same three basic components: (1) a probe assembly, which is an umbilical that feeds airflow sample into the analyzer, fitted at both ends with filters; (2) a flow monitor, which measures total airflow volume; and (3) an analyzer, described as the "heart" of the CEMS, which measures the concentrations of pollutants.  Tr. at 392–93, 584; Ex. D-7 at 21259, 21263.

#### 1.  2011

During installation of the first CEMS, there were problems relating to inaccurate configuration data provided by Steel but by mid-March, the analyzers had been "re-ranged" with updated data Steel provided.  Ex. P-6 at 23684; Ex. P-9 at 1–2.[13]  In two subsequent service visits over the next two months, Altech engineers addressed analyzer and computer issues, with an Altech engineer concluding as early as mid-April that service work remained "incomplete" because computer changes were required.  Ex. P-9 at 3–4, 12.

---

below, the express warranty fails of its essential purpose.

[12] "Except for Supplier's indemnity obligations, in no event shall Supplier's liability to Buyer exceed the Purchase Price whether attributable to contract, warranty, tort (including negligence), strict liability, or otherwise. In addition, in no event shall Supplier be liable for special, indirect, incidental, consequential, or punitive damages whether attributable to contract, warranty, tort (including negligence), strict liability or otherwise."  Ex. P-4 at § 27.

[13] The March 10, 2011, service report indicates that Altech re-ranged the $SO_2$ and CO according to the updated data but not the $NO_x$.

By mid-October, the analyzer in the second CEMS could not measure $SO_2$ or $NO_x$, the DAS computer was "not working," and all three temperature controllers in the first CEMS malfunctioned and had to be replaced. *Id.* at 14. Similar problems continued throughout 2011. *Id.* at 15–16; Ex. P-6 at 24162.

## 2. 2012

Throughout 2012, there were multiple service visits and persistent problems with the analyzers in both CEMS and their shared DAS computer. *See, e.g.*, Ex. P-9 at 20, 56; Ex. P-7 at 24800, 24887, 24895. Both CEMS indicated "[thousands] of alarms daily." Ex. P-7 at 24378. By the end of June, Steel bought a new computer and prepared to install a new version of software from Contec provided by Altech. Ex. D-31 at 2718–20.

Altech conducted nine more service visits in 2012. Ex. P-9 at 20–84. Though the Altech engineers were able to calibrate the CEMS for most pollutants by the end of each visit, after the engineers left, problems would recur. By April, "[t]hings look[ed] ugly;" there were still "[m]ultiple calibration failures [and] [r]epeatability … [was] an issue." Ex. P-7 at 24455.

By late August, the first CEMS passed part of a 7-Day Drift Test. *Id.* at 24820. But, performance testing of the second CEMS remained "very unstable on all calibrations." *Id.* According to one Altech engineer, to "truly fix" the problems with the second CEMS, software in the analyzer had to be downloaded from the on-site CEMS, transferred to a test unit at Altech, repaired, and then re-loaded back onto the on-site CEMS. *Id.* at 24825. There is no evidence this repair was ever performed. On August 21, 2012, a vice president for Steel e-mailed Mike Church, an Altech support manager, stating, "We still have critical issues …. Time is long past when these things should be working accurately and reliably." *Id.* at 24818.

## 3. 2013

Into 2013, Steel employees and Altech engineers struggled to identify or correct continuing

problems, including recurrent issues with analyzers, temperature controllers, and the computer. Computer problems came to a head in 2013 when, on January 10, Contec notified Altech that "[t]here are major problems with the databases for 2012 [and] 2011." Ex. P-8 at 24992. After learning from Contec about the database problems, on January 30, Church e-mailed Steel that the DAS computer was corrupted. Tr. at 479–80; Ex. P-8 at 663. Mark Chamberlin, an Altech technical support manager, described the computer as "faulty" in a February 5 e-mail to Steel. Ex. P-8 at 25051, 25119.

In late March, Altech purchased a replacement computer and shipped it to Steel. *Id.* at 10; Ex. P-14 at 4974–79.[14] The replacement computer and software, provided at no cost to Steel, suffered the same problems as the computer originally shipped. On June 12, Chamberlin reported that the new software was causing the CEMS analyzers to malfunction. Ex. P-8 at 25405. Toward the end of 2013, analyzers in both CEMS produced faulty data and a RATA still could not be scheduled, exceeding Altech's own revised deadline by almost a year. Tr. at 547–48; Ex. P-7 at 24904, 24915–16; Ex. P-8 at 25677. Altech e-mailed Steel on December 5, stating that the warranty on the first CEMS expired January 25, 2013, and the warranty on the second CEMS expired July 22, 2013. Ex. P-8 at 25751. Bryan Vogel, Steel's engineering lead for the CEMS project, e-mailed Church back the same day, copying Chamberlin: "We will have to discuss this as we still do not have a usable system." *Id.*

On June 28, 2013, MDEQ issued Steel a Notice of Violation. Ex. P-12 (unnumbered at 12–14). The Notice cited two violations of Steel's Title V Permit: (1) Steel reported the CEMS were installed but the CEMS could not function longer than twelve to seventy-two hours at a time and could not pass a RATA, and (2) Steel failed to report CEMS malfunctions. *Id.* After meeting with

---

[14] Altech stipulated to the authenticity of P-14, Steel's exhibit collecting invoices for CEMS-related expenses, and made no objection to its admission at trial. Doc. #86 at § 10.a; Tr. at 81.

MDEQ, Steel retained a different CEMS vendor to conduct an ambient air test on the Altech CEMS. Tr. at 182–83, 343.

For the ambient air test, the CEMS were removed from the airflow of the steel plant and placed outdoors for two to three weeks and were then observed for whether they could accurately detect pollutant concentrations in calibration gasses each morning. *Id.* at 592–93. Regarding NO$_x$— a regulated pollutant with which both CEMS had often struggled—the systems "failed pretty badly." *Id.* Though the CEMS worked for some pollutants, the analyzer component responsible for measuring NO$_x$ "failed about every way you could fail. The NO$_x$ wasn't working." *Id.* at 593. Steel gave up on the Altech CEMS because it considered the results of the ambient air test to be a failure. *Id.* at 183, 343. Steel and MDEQ subsequently negotiated a fine of $135,000, which Steel paid, with Steel agreeing to contract with a third party to conduct monthly emissions testing until Steel installed working CEMS. *Id.* at 193–94.

### III
### Liability

Steel asserts three grounds for liability: (1) negligence, (2) breach of implied warranties, and (3) breach of contract.[15] The parties concede that Mississippi's Uniform Commercial Code ("U.C.C.") applies to this case. Tr. at 368–69; Doc. #79 at 10; Doc. #97 at 20.

### A. Negligence

The elements of negligence are: (1) duty, (2) breach, (3) factual and proximate cause, and (4) damage. *Duckworth v. Warren*, 10 So. 3d 433, 439 (Miss. 2009). "[T]he breach of a contract (whether described as 'negligent' or not) is not actionable in tort under an ordinary negligence theory

---

[15] Steel also asserts an express warranty claim, in support of which it points only to § 14 of the Terms, which disclaims any express warranty other than the one it sets forth. Doc. #78 at 14; Doc. #97 at 31; Ex. P-4 at § 14. This is not a case in which Steel, relying on § 2-313(1)(a) of Mississippi's Uniform Commercial Code—which describes an express warranty as "*[a]ny* affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain"—points to statements Altech made outside of the Terms to establish the existence of an express warranty. As such, Steel's express warranty claim is subsumed by its claim for contractual warranty included in its breach of contract claim.

unless breaching the contract also breached a duty of care recognized by tort law. There must be a duty of care 'fixed by law and independent of the contract.'" *Clausell v. Bourque*, 158 So. 3d 384, 391 (Miss. Ct. App. 2015) (en banc) (quoting *Hazell Mach. Co. v. Shahan*, 161 So. 2d 618, 623 (1964)).

Steel, citing *Montgomery v. CitiMortgage, Inc.*, 955 F. Supp. 2d 640, 649 (S.D. Miss. 2013), argues that "[a] contractual obligation satisfies the duty element of a negligence claim." Doc. #78 at 12. To the contrary, as *Montgomery* recognizes, it is the failure to use reasonable care in the performance of a contract that breaches a duty in tort, not the mere failure to perform. *Montgomery*, 955 F. Supp. 2d at 648 (citing *Poppelreiter v. GMAC Mortg., LLC*, No. 1:11cv8, 2011 WL 2690165, at *3 (N.D. Miss. July 11, 2011)) ("Under Mississippi law, '[a] contract creates a reasonable duty of care in fulfilling one's contractual obligations.'"); *id.* at 640 ("CitiMortgage was also required to employ due care in the processing of the Plaintiffs' request to lower their mortgage payments and in the resulting loan modification process undertaken by the parties."). Put differently, the tort duty founded on contract is breached not by failing to perform the contract obligation at all but by causing damages due to carelessness in the performance of the contract. Steel has made no allegation in this regard. Accordingly, Steel's negligence claim must fail.[16] *See, e.g.*, *Clausell*, 158 So. 3d at 392 ("[E]ven if [defendant] had a contractual obligation …, [plaintiff] has failed to show that breaching that contract was a breach of a duty of care … under a negligence theory.").

### B. Breach of Implied Warranties – Contractual Disclaimer

Turning to Steel's claims for breach of implied warranties, Altech argues that such claims are

---

[16] Steel posited in its closing arguments at trial that Altech failed to subject the CEMS to proper quality control (a claim contested at trial) and sent an inexperienced engineer to start-up the second CEMS. Tr. at 473–74, 630. However, Steel offered no evidence either of the tasks the engineer shirked or carelessly attempted or of the steps in Altech's quality control that were missing or improperly carried out. Indeed, Steel's entire evidence for both claims is a single e-mail too vague to support a finding even that there was any relevant issue at all. Ex. P-6 at 11. Consequently, Steel fails to establish breach even if it identified a proper duty. *See, e.g., Couch v. City of D'Iberville*, 656 So. 2d 146, 151–52 (Miss. 1995) (negligence action based on contract fails without independent proof of breach).

barred by the Terms.

The express language of the Terms bars all implied warranty claims. Ex. P-4 at § 14. Absent fraud, illegality, or mutual mistake, this Court cannot "modify, add to, or subtract from the terms of a contract validly executed between two parties." *Elchos v. Haas*, 178 So. 3d 1183, 1191 (Miss. 2015) (quoting *Wallace v. United Miss. Bank*, 726 So. 2d 578, 584 (Miss. 1998)). However, "parties are not at liberty to enforce contract provisions which contradict Mississippi law and public policy." *Jones-Smith v. Safeway Ins. Co.*, 174 So. 3d 240, 248 (Miss. 2015). There is no dispute that the Terms constitute a valid contract. Accordingly, the Terms must be enforced unless contrary to law.

As relevant here, two Mississippi statutes concern the extent to which a contract for the sale of goods may limit liability or remedies under an implied warranty: § 11-7-18 and § 75-2-719(4) of the Mississippi Code.[17] Section 11-7-18, by its express provisions, renders unenforceable contract terms that bar implied warranty claims. Yet, § 11-7-18 does not apply here. The statute was amended on July 1, 2010, less than two months before Steel issued its August 17, 2010, purchase order for the CEMS. The amendment limited its application to sales "to a consumer … of consumer goods." Miss. Code Ann. § 11-7-18 (2010).

Steel concedes that it is a non-consumer and that the CEMS are non-consumer goods. Doc. #49-6 at 1. Accordingly, there is no dispute that § 11-7-18 is inapplicable in this case. Rather, Steel relies on § 75-2-719(4) for the proposition that the disclaimer of implied warranty claims is invalid. The pre-amended version of § 75-2-719(4) applicable in this case[18] states:

---

[17] Section 75-2-719(4) is a non-standard addition to Article 2, § 719, of the Model Uniform Commercial Code. *See* Uniform Commercial Code § 2-719 & cmt. (Am. Law Inst. & Unif. Law Comm'n 2014). It is unique to Mississippi. *Powers v. Lycoming Engines*, 272 F.R.D. 414, 429 & n.53 (E.D. Pa. 2011). Section 11-7-18, also unique to Mississippi, is not a Mississippi U.C.C. statute. *Id.* at 428 & n.33. Both statutes are limited to sales of goods.

[18] Effective July 1, 2013, § 75-2-719(4) was also amended so that it now applies only to consumer sales of goods. However, Mississippi courts have "continuously followed the rule that statutes will be construed to have a prospective operation only, unless a contrary intention is manifested by the clearest and most positive expression." *Hudson v. Moon*, 732 So. 2d 927, 930–31 (Miss. 1999). There is no indication that the 2013 amendment was intended to have a retroactive effect. Accordingly, the Court concludes that the amendment was not retroactive. The Court, therefore, will

*Any limitation of remedies which would deprive the buyer of a remedy to which he may be entitled for breach of an implied warranty of merchantability or fitness for a particular purpose shall be prohibited.* The provisions of this subsection do not apply to computer hardware, computer software, and services performed on computer hardware and computer software, which are sold between merchants.

Miss. Code Ann. § 75-2-719(4) (2011) (emphasis added) (effective July 1, 1998). Steel argues that "remedies" includes liability and that as a result, § 75-2-719(4) prohibits contract terms that bar implied warranty claims. Doc. #58 at 4. Altech contends that "remedies" is unambiguous and does not include liability. Doc. #50 at 15. Alternatively, Altech urges that § 75-2-719(4) must be interpreted in a way that gives effect to the words "in a sale to a consumer … of consumer goods" in § 11-7-18, as amended. Doc. #63 at 3.

### 1. Mississippi Supreme Court precedent

In *Massey-Ferguson, Inc. v. Evans*, the Mississippi Supreme Court held that a buyer of farm equipment could maintain a consequential damages claim for breach of implied warranty even though the purchase terms precluded incidental and consequential damages and the sale occurred on an "as is … basis without any warranty, express or implied." 406 So. 2d 15, 17–18 (Miss. 1981). The court wrote that the claims must be permitted "because of two statutory enactments." *Id.* In this regard, the court quoted both § 75-2-719(4) and § 11-7-18. *Id.* When quoting § 11-7-18, the court noted that the statute "further emphasize[d] th[e] prohibition" of § 75-2-719(4). *Id.*

In its analysis, the *Massey-Ferguson* court did not state which statute prohibited what. Both by their express terms prohibit limitation of remedies. While the court could have meant that § 11-7-18 "further emphasize[d]" a prohibition on disclaimers of liability in § 75-2-719(4), it could have meant that § 11-7-18 emphasized § 75-2-19(4)'s express prohibition of limitations on remedies.

---

apply the version in effect at the time of the parties' contract. *See generally Price v. Harley*, 107 So. 673, 674 (Miss. 1926) ("The nature, construction, and effect of a contract are governed by the laws existing when and where it was made, or where it is, by its terms, to be performed; and, in this respect, the rights of the parties under the contract are beyond the legislative power.").

Thus, it is far from clear that the court held § 75-2-719(4) *impliedly* prohibited waiver or disclaimer of implied warranties on its own when the language it quoted from § 11-7-18 *expressly* did the same thing. In any event, once § 11-7-18 became limited only to consumer sales of goods, *Massey-Ferguson* became distinguishable from non-consumer-sale cases. The case relied on "two statutory enactments," only one of which survived beyond July 1, 2010, in a form that applies to non-consumer sales.

The Mississippi Supreme Court has never prohibited an implied warranty disclaimer in sales of goods on the basis of § 75-2-719(4) alone.[19] Mississippi Supreme Court cases that by their facts involve non-consumer transactions apply only the pre-amended § 11-7-18 without mentioning § 75-2-719(4). *See, e.g., J.L. Teel Co. v. Houston United Sales, Inc.*, 491 So. 2d 851, 859 (Miss. 1986) (copier leased for business use); *Little v. V & G Welding Supply, Inc.*, 704 So. 2d 1336, 1341 (Miss. 1997) (propylene gas used for welding).

## 2. *Erie* guess

Because no holding of the Mississippi Supreme Court is on point, this Court must predict whether that court would hold that the pre-amended § 75-2-719(4) renders unenforceable contract terms barring implied warranty claims in non-consumer sales of goods. *See McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 472 (5th Cir. 2015) ("Because the Texas Supreme Court has not defined the scope of Section 392.403(a)(2)[,] ... our job is to 'predict' how the court will rule."). In so predicting, the first task is to examine the relevant holdings of Mississippi's intermediate appellate court. *Id.* This Court defers to those precedents unless "other persuasive data" indicate that the Mississippi Supreme Court would hold otherwise. *Id.* at 472–73.

Two Mississippi Court of Appeals cases mention § 75-2-719(4) in the context of disclaimer

---

[19] *See Fedders Corp. v. Boatright*, 493 So. 2d 301, 308 (Miss. 1986); *Beck Enters., Inc. v. Hester*, 512 So. 2d 672, 676 (Miss. 1987); *Gast v. Rogers-Dingus Chevrolet*, 585 So. 2d 725, 728 (Miss. 1991); *N. River Homes, Inc. v. Bosarge*, 594 So. 2d 1153, 1159 n.6 (Miss. 1992); *Mercury Marine v. Clear River Constr. Co.*, 839 So. 2d 508, 514 (Miss. 2003).

of implied warranties—*Settlemires v. Jones*, 736 So. 2d 471, 474 (Miss. Ct. App. 1999); and *Murray v. Blackwell*, 966 So. 2d 901, 904–05 (Miss. Ct. App. 2007). Both involve consumer sales and rely on § 75-2-719(4) and § 11-7-18 in combination. Notably, in *Murray*, the Court of Appeals, in holding that Mississippi law permitted implied warranty disclaimers for late-model used-vehicle sales, only considered the effect of § 11-7-18 on such disclaimers. 966 So. 2d at 904–05. This analytical framework strongly suggests that § 75-2-719(4) does not cover such disclaimers. The guidance from Mississippi's intermediate appellate court thus supports the holding that § 75-2-719(4) does not bar implied warranty disclaimers in non-consumer sales.

### 3. Statutory construction of § 75-2-719(4)

The Court next must decide whether the Mississippi Supreme Court would hold that § 75-2-719(4), as it existed at the time of the contract here, barred implied warranty disclaimers in non-consumer sales. As this is a diversity case, the Court will interpret Mississippi statutes according to Mississippi's rules of statutory construction. *United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 573 F.3d 997, 1001 (10th Cir. 2009) ("When interpreting a state statute in a diversity case, [the] court must apply state rules of statutory construction."); *Weeks Tractor & Supply Co., LLC v. Arctic Cat, Inc.*, 784 F. Supp. 2d 642, 647 (W.D. La. 2011) ("A federal court sitting in diversity applies state substantive law, including the state's choice of law rules and method of statutory interpretation.").

Under Mississippi law, a court's goal in construing a statute is to give effect to the intent of the Mississippi legislature. *Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 1027 (Miss. 2011). In determining legislative intent, a court must first determine the plain meaning of a word at issue and if such meaning is "clear and unambiguous," it must be applied. *Roop v. S. Pharm. Corp.*, 188 So. 3d 1179, 1185–86 (Miss. 2016) (quoting *Lawson*, 75 So. 3d at 1027). In the absence of a statutory definition, a word's "plain meaning" is its "common and ordinary acceptation and meaning." *Lawson*, 75 So. 3d at 1028 (citing Miss. Code Ann. § 1-3-65). To determine ordinary meaning, the

Mississippi Supreme Court may look to definitions in dictionaries and in its previous holdings. *Id.* at 1027 & n.4, 1028.

If an ambiguity exists, a court must "turn to the principles of statutory construction." *Oktibbeha Cty. Hosp. v. Miss. State Dep't of Health*, 956 So. 2d 207, 212 (Miss. 2007). In doing so, "it is the Court's duty to 'carefully review statutory language and apply its most reasonable interpretation and meaning to the facts of a particular case.'" *Miss. Methodist Hosp. & Rehab. Ctr., Inc. v. Miss. Div. of Medicaid*, 21 So. 3d 600, 608 (Miss. 2009) (quoting *Caldwell v. N. Miss. Med. Ctr.*, 956 So. 2d 888, 891 (Miss. 2007)). To this end, "[w]hen reasonable, th[e] Court is obliged to reach an interpretation that gives effect to all of the statutory language." *Id.* When a statute has been amended, "meaning must be given to the amending words as they mesh into the statute because they were legislatively chosen for definite purpose." *Brady v. John Hancock Mut. Life Ins. Co.*, 342 So. 2d 295, 303 (Miss. 1977).

Neither the pre-amended § 75-2-719(4) nor the definitions section of Mississippi's U.C.C. define "remedies." Miss. Code Ann. §§ 75-2-103, 75-2-719(4) (2010). Thus, the Court must first review the word's ordinary meaning.

Black's Law Dictionary defines "remedy" as "[t]he means of enforcing a right or preventing or redressing a wrong; legal or equitable relief." *Remedy*, Black's Law Dictionary (10th ed. 2014). The definition includes an action and an object. The action is "redressing" or "enforcing," and the object is a "right" or "wrong." There are "settled distinctions between rights accruing under contracts and remedies for their enforcement." *Coffman v. Bank of Ky.*, 40 Miss. 29, 32 (1866). Liability arises from the "right" whereas remedies "pertain[] to the modes of proceeding[,]" which in themselves establish no rights. *Price v. Harley*, 107 So. 673, 674 (Miss. 1926). From this distinction, it follows that "remedies" in § 75-2-719(4) pertain to the means of redressing breach of

an implied warranty. These means could be many—from trial to arbitration and from damages to injunction. When framed in this fashion, § 75-2-719(4) prohibits a seller from limiting a buyer to just a subset of these many remedies when a seller breaches an implied warranty.

Other principles of statutory interpretation lead to the same result. Even supposing "remedies" is ambiguous, the Court cannot adopt Steel's proposed interpretation. To do so would fail to give effect to all statutory language and meaning to all amending words. Steel would have this Court hold that § 11-7-18's 2010 amendment did virtually nothing. Section 11-7-18 prohibits contract terms that bar implied warranty claims. Its 2010 amendment limited that prohibition to "a sale to a consumer … of consumer goods." Instead of actually limiting this prohibition to consumer sales, Steel argues that § 75-2-719(4) still preserved implied warranties in almost all non-consumer sales, except for sales between merchants of computer hardware, software, and services on such. If so, § 11-7-18's amendment would have been largely pointless. Put differently, Steel implies that § 11-7-18's broad amending language only affected computer-related sales between merchants. At bottom, Steel wants this Court to read the two statutes as almost entirely co-extensive, and this Court cannot do so without failing to give due effect to the differing text of the statutes and to the meaning of § 11-7-18's amending language. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings…. This is particularly so where the scope of the earlier statute is broad but … subsequent statutes more specifically address the topic at hand.").

Section 75-2-719(4) covers only disclaimer of remedies for beach of implied warranties and does not prohibit disclaimer of liability for such warranties. No persuasive authority indicates that the Mississippi Supreme Court would hold otherwise—consequently, § 75-2-719(4) does not

prohibit the Terms barring the implied warranty claims Steel asserts. Steel's implied warranty claims are barred by the Terms and therefore must fail.[20]

## C. Breach of Contractual Warranty

Steel argues that Altech breached its contractual warranty in two ways: (1) by delivering CEMS that "never became operational" and (2) by delivering CEMS that failed to comply with the express warranty in the Terms that the CEMS "shall be of good quality and free from defects … [and] shall be suitable and sufficient for their specified purpose."[21] Doc. #97 at 30, 31.

The parties stipulated that when Steel ordered the CEMS, "[Altech] understood that [Steel] intended to use the CEMS units to monitor emissions [from its Columbus, Mississippi, steel plant] in compliance with the Title V permit that MDEQ issued to [Steel]." Doc. #86 at § 9.a.(5), (6). To do so is therefore the "specified purpose" of the CEMS.[22] As noted above, the proposal states that the CEMS would be "very well suited to monitoring emissions on arc furnaces" and would monitor the pollutants, listed above, regulated under Steel's Title V permit. Ex. P-2 at 23.

From installation, the CEMS suffered recurrent malfunctions, about which Steel frequently notified Altech. Tr. at 343; *see generally* Exs. P–5–8. Soon after installation, both CEMS struggled to measure $NO_x$, a pollutant regulated under Steel's Title V permit, which suitable and sufficient CEMS must have been able to measure consistently. Additionally, the computer—an essential

---

[20] Steel cited *Patches Farms, Inc. v. Thompson Mach. Commerce Corp.*, No. 4:06-CV-163, 2008 WL 1821735 (N.D. Miss. Apr. 22, 2008), for the contrary proposition. *Patches* was decided before July 1, 2010, when § 11-7-18 applied to non-consumer sales. For that reason, it is distinguishable from the case here. So too is *Wells v. Robinson Helicopter Co.*, No. 3:12-CV-564, 2015 WL 1189847, at *4 (S.D. Miss. Mar. 16, 2015), which held that Mississippi law prohibits disclaimer of implied warranties in a pre-2009 sale of a helicopter.

[21] As explained above, Steel also asserted a breach of contractual indemnity claim, which was orally dismissed by judgment on partial findings at trial.

[22] This conclusion is buttressed to the extent it is consistent with the prior proposal, which the purchase order specifically references, both generally and by numbered item. *See* Miss. Code Ann. § 75-1-303(d) ("A … course of dealing between the parties … is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement."); *Earman Oil Co. v. Burroughs Corp.*, 625 F.2d 1291, 1297 (5th Cir. 1980) (prior terms document constituted course of dealings between parties such that terms defined parties' rights along with executed purchase order); *Massey-Ferguson*, 406 So. 2d at 17 (finding contract in purchase order and associated express limited warranties).

component of the CEMS—regularly malfunctioned. Tr. at 487–88. Altech frequently attempted to correct such problems in an ongoing remedial effort, which included providing replacement parts and repair services covered under warranty. *Id.* at 649; Ex. P-8 at 25751. Ultimately, the problems were never adequately corrected. Tr. at 179, 314. It took Altech over two years to get either CEMS to pass a 7-Day Drift Test, and even then, the CEMS still malfunctioned. *Id.* at 414, 528–29, 536; 597–98; Ex. P-8 at 25693, 25708. In nearly three years, the first CEMS only once ever produced data consistent and accurate enough for a 7-Day Drift Test, and the second CEMS only four times and never longer than nineteen days. Tr. at 421. Neither CEMS passed a RATA.

While Steel improperly installed the CEMS and initially supplied Altech with inaccurate data,[23] the bulk of the recurring problems, which related to the analyzers or the computer, had little or nothing to do with these deficiencies. The inaccurate configuration data was corrected within a month after installation of the first CEMS, Ex. P-6 at 1;[24] and, as the only general CEMS expert to testify at trial credibly concluded, the inaccurate data did not cause recurrent problems,[25] Tr. at 587.

---

[23] Steel was "partly responsible" for problems relating to installation, according to Anna Chappell, Steel's testifying corporate representative. Tr. at 271–72. These installation problems included failing to mount the CEMS in a properly air-conditioned room and supplying Altech with inaccurate data needed to configure the systems. *Id.* at 245–46. Steel was also responsible for certain problems related to maintenance, including improperly connecting bottles of calibration gas (pollutants of known concentration used to test and calibrate the analyzers), which caused the bottles to leak. Some such maintenance problems, however, caused no damage to the CEMS and none involved the analyzers themselves or the DAS computer. *Id.* at 280–82; Ex. D-30 at 4471–73.

[24] Church testified that there was a third configuration change but he also testified that he lacked knowledge of the change or configuration matters generally, and he never testified that the first data update was inaccurate. Tr. at 515–16. To the extent Church suggests Altech's updated data was also inaccurate, such testimony is incredible. Generally, to the extent Church's trial testimony sought to explain all problems with the CEMS—especially those related to the computer—as unavoidable or the fault of Steel, it was not credible. *See, e.g., id.* at 539 ("There is [sic] always DAS issues. Q[:] Two years later? A[:] Sure."); *id.* at 540–41 ("[Altech is] telling Contec, 'We still have problems with the DAS logic ....' So that's not the plant's fault, is it? A[:] Not the plant's fault.... Well, it could be. It depends on if somebody was messing with the DAS, pushing buttons. Yeah, it could be actually.").

[25] The same expert, designated by Altech, credibly concluded that problems with the computer software were Altech's responsibility and that recurring issues related to the analyzers—especially to one of two main analyzer components called the "CLD," which measured $NO_x$—were only partially related to maintenance. Tr. at 588–89, 593, 606. Regarding the computer issues, Chamberlain admitted at trial that the issues were "recurring," and Church, who was extensively involved with Altech's remedial efforts, admitted that such issues were not "plant maintenance issue[s]." *Id.* at 488, 539. Thus, it appears the malfunctions in the originally-shipped computer were most likely caused by defective software installed by Altech. *Id.* at 573–74, 606. Though the precise cause of the analyzer malfunctions cannot be determined, the cause may have been related to the software defects and in any event were only partially related to

For these reasons, the Court concludes that the CEMS, as delivered, were unsuitable and insufficient for their specified purpose—monitoring pollutants in compliance with Steel's Title V permit. *Id.* at 343. Thus, Altech breached the contractual warranty.

## IV
## Damages

Steel seeks $424,270.20 in direct damages; $307,704.97 in consequential damages; and $259,024.93 in incidental damages. Doc. # 97 at 26. As an initial matter, Altech argues that Steel can recover no damages because Steel failed to give notice to Altech of breach.

### A. Notice of Breach

Section 75-2-607(3)(a) of the Mississippi U.C.C. provides that "[w]here a tender has been accepted … the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Adequate notice need not be a "specific claim for damages or an assertion of legal rights." *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 368 (5th Cir. 2002) (quoting *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 976 (5th Cir. 1976)); *T. J. Stevenson & Co. v. 81,193 Bags of Flour*, 629 F.2d 338, 359 (5th Cir. 1980)). Rather, "[t]he adequacy and timeliness of notice under section 2-607 typically depend upon the reasonableness of the buyer's efforts to communicate his dissatisfaction." *T. J. Stevenson*, 629 F.2d at 359 n.41 (quoting *E. Air Lines, Inc.*, 522 F.2d at 973).

When, as here, a buyer is a non-consumer, adequate notice requires the buyer, through his "conduct … taken as a whole," to notify the seller that he claims the transaction involves a breach. *Id.* at 364 (quoting *E. Air Lines, Inc.*, 522 F.2d at 978); *accord Peavey Elecs. Corp. v. Baan U.S.A., Inc.*, 10 So. 3d 945, 958–59 (Miss. Ct. App. 2009) (en banc) (applying *Eastern Air* where both parties were merchants under U.C.C.). "The notice requirement exists to prevent commercial bad

---

maintenance. Ex. P-8 at 17; Tr. at 580, 588.

faith, promote mitigation and cure, enable the seller to collect evidence while still fresh, and promote settlement." *Peavey Elecs.*, 10 So. 3d at 957.[26]

Two messages from Steel to Altech together constitute timely and adequate notice under § 2-607(3)(a): (1) the August 21, 2012, e-mail from a Steel vice president to Church, stating, "We still have critical issues …. Time is long past when these things should be working accurately and reliably;" and (2) the January 25, 2013, e-mail from Vogel to Church and Chamberlin, stating that Steel and Altech would have to "discuss" ending the CEMS warranty period because Steel "still [did] not have a usable system." Each of these e-mails timely and reasonably communicated Steel's dissatisfaction and put Altech on notice that Steel considered the CEMS transaction to involve a breach of Altech's express warranty that the CEMS would be suitable and sufficient for monitoring pollutants in compliance with the Title V permit.[27] *See Exim Brickell LLC v. PDVSA Servs. Inc.*, 516 F. App'x 742, 752–53 (11th Cir. 2013) (single e-mail calling for "urgent meeting" provided sufficient notice "that … goods were non-conforming" under Florida's Uniform Commercial Code, "especially in light of the prolonged discussions between the parties").

Even if the e-mails were insufficient on their own, they, together with Steel's other conduct, were more than adequate to notify Altech that Steel believed the contract to have been breached. First, Steel sent Altech numerous e-mails, fairly regularly, beginning from installation of the first CEMS, to complain about malfunctions. Second, in response to these continual complaints, Altech

---

[26] *Accord T. J. Stevenson*, 629 F.2d at 361 (holding notice under § 2-607(3)(a) "must be evaluated from the perspective of the policies which it seeks to encourage: compromise by the parties; and conduct within the bounds of commercial good faith."); *E. Air Lines*, 522 F.2d at 972 ("Early warning permits the seller to investigate the claim while the facts are fresh, avoid the defect in the future, minimize his damages, or perhaps assert a timely claim of his own against third parties.").

[27] Consequently, this case is distinguishable from *C.R. Daniels, Inc. v. Yazoo Mfg. Co.*, 641 F. Supp. 205 (S.D. Miss. 1986), upon which Altech relies. In that case, the buyer's "notification to [seller] consisted solely of several vague references to problems with the product, [and] the return of, at most, three bags and a warranty claim of $64.40. At the same time, [buyer] consistently told [seller] that he anticipated taking delivery of all bags and frames in the future ...." *Id.* at 211. Under those circumstances, the seller "had no reason even to suspect" that the buyer "considered the contract to be breached." *Id.*

provided warranty parts and services; Steel's continuing assertion of dissatisfaction therefore implied that it believed the CEMS remained in breach of their warranty. These facts would have clearly indicated to Altech that Steel's August 2012 and January 2013 e-mails each amounted to an assertion of breach. Third, as noted above, the specified purpose of the CEMS was Title V compliance, and credible, unrebutted testimony at trial established that Steel made clear to Altech in numerous conversations over several years that problems with the CEMS were resulting in Steel's non-compliance with its Title V permit. Tr. at 343. Under these circumstances, Steel satisfied the purpose of notice—which, as relevant here, is to promote settlement, commercial good faith, and mitigation and cure. Steel's 2013 e-mail came at the end of the parties' joint efforts to cure and mitigate and invited "discuss[ion]" on Altech's contractual obligations, the issue Steel later raised in this action.

### B. Damages Limitations

Altech alternatively argues that Steel's recoverable damages are limited by the three damages limitations clauses in the Terms: one that limits remedies for breach of the express warranty to repair and/or replacement of the CEMS at Altech's option, a second that limits damages to the CEMS purchase price, and the third that precludes consequential and incidental damages.

#### 1. Limitation to purchase price

As will be explained below, Steel's recoverable damages are $83,320.27—less than the $447,610.20 purchase price of the CEMS. Consequently, the applicability of the provision in the Terms limiting recoverable damages to the CEMS purchase price is not at issue.

#### 2. Limitation to repair and/or replacement

The express warranty contained in the Terms is an exclusive limited warranty, providing as a remedy only repair and/or replacement of goods at Altech's option and only if Steel provides notice within a specified time. Steel argues that this limitation is inapplicable in this case because the

exclusive repair-and/or-replace warranty failed of its essential purpose.

Under § 75-2-719(2) of the Mississippi U.C.C., "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in [the] code." In this regard, an exclusive limited warranty "presupposes … that the warrantor will fulfill his warranty." *Ford Motor Co. v. Fairley*, 398 So. 2d 216, 219 (Miss. 1981). "The test in determining whether a limited warranty failed of its essential purpose is whether the buyer is given, within a reasonable time, goods that conform to the contract." *Delhomme Indus. v. Houston Beechcraft, Inc.*, 669 F.2d 1049, 1063 (5th Cir. 1982) (applying Kansas' Uniform Commercial Code identical in relevant part to Mississippi's U.C.C.). "The purpose of a repair-or-replace contracted remedy is to give the buyer what he bargained for …. This purpose is defeated if the goods are destroyed by their own flaws so that repair or replacement are totally unsatisfactory." *Mercury Marine v. Clear River Const. Co.*, 839 So. 2d 508, 513 (Miss. 2003).

Here, the exclusive repair-and/or-replace warranty failed of its essential purpose. Despite over three years of remedial efforts by Altech, the critical malfunctions of the CEMS were never corrected, and the CEMS remained unsuitable and insufficient for their specified purpose— monitoring the pollutants in Steel's Title V permit. Thus, Altech failed to deliver CEMS conforming to the contractual warranty within a reasonable time, depriving Steel of its bargained-for benefit. *See Chatlos Sys., Inc. v. Nat'l Cash Register Corp.*, 635 F.2d 1081, 1086 (3d Cir. 1980) (failure of essential purpose found where seller "repeatedly attempted to correct the deficiencies in [computer] system, but nevertheless still had not provided the product warranted a year and a half after [buyer] had reasonably expected a fully operational computer."). Accordingly, the exclusive limited warranty does not limit Steel's remedies.

### 3. Preclusion of consequential and incidental damages

Altech insists that the separate consequential and incidental damages limitation in the Terms

precludes such damages in this case. Yet, reading the contractual provisions as a whole—including the stipulated purpose of the CEMS appearing in the proposal which, together with the Terms, comprise the governing contract—the Court concludes that the damages limitation "presuppose[d] … that the warrantor [would] fulfill his warranty" as much as the limited warranty did. *See Riley v. Ford Motor Co.*, 442 F.2d 670, 671 n.1, 673–74 (5th Cir. 1971) (applying Alabama's Uniform Commercial Code identical in relevant part to Mississippi's U.C.C. and considering consequential damages where exclusive repair-or-replace warranty containing consequential damages limitation failed of its essential purpose); *Massey-Ferguson*, 406 So. 2d at 17, 19 (allowing consequential damages despite exclusive limited remedy precluding such damages). Thus, in this case, to the extent that the exclusive repair-and/or-replace warranty failed of its essential purpose, the separate consequential and incidental damages limitation also fails under § 75-2-719(2) with respect to damages resulting from the breach of warranty.

### C. Calculation of Damages

"Damages recovered in any case must be shown with reasonable certainty, both as to their nature and in respect to cause from which they proceed." *Mo. Bag Co. v. Chem. Delinting Co.*, 58 So. 2d 71, 78 (Miss. 1952). In this regard, "the plaintiff has the burden of proving any amount of damages with reasonable certainty." *Brothers v. Winstead*, 129 So. 3d 906, 925 (Miss. 2014. Though "the measure of damages need not be perfect, the most accurate and reliable evidence available should be required." *Puckett Mach. Co. v. Edwards*, 641 So. 2d 29, 36 (Miss. 1994) (quoting *City of New Albany v. Barkley*, 510 So. 2d 805, 807 (Miss. 1987)).

There is no dispute that Steel accepted each CEMS at its installation and that Steel never revoked or attempted to revoke its acceptance. *See* Tr. at 315 (Altech CEMS remain at Steel's Columbus, Mississippi, steel plant). Where, as here, an exclusive limited contractual warranty fails of its essential purpose and the buyer has not revoked acceptance, "the appropriate UCC remedy is

found in the provisions covering damages for breach of warranty"—that is, U.C.C. § 2-714(2) and (3). *Delhomme Indus., Inc. v. Houston Beechcraft, Inc.*, 735 F.2d 177, 184 (5th Cir. 1984).

### 1. Direct damages

Under § 75-2-714(2), "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstance show proximate damages of a different amount." The buyer bears the burden of producing evidence proving the difference in value between the goods as accepted and the goods as warranted. *Gast v. Rogers-Dingus Chevrolet*, 585 So. 2d 725, 731 (Miss. 1991).

Steel does not offer any evidence of the CEMS' value at the time of acceptance.[28] Contrary to Steel's sole argument in this regard, it is not enough that the CEMS malfunctioned on delivery and could not be repaired; rather, under § 75-2-714(2), to recover the purchase price as direct damages in such a case, the evidence must also show that the CEMS are worthless. *Fedders Corp. v. Boatright*, 493 So. 2d 301, 309 (Miss. 1986) ("If the heat pump could not be repaired *and* was worthless, the Boatrights under § 75-2-714 would have been entitled to a refund of the purchase price.") (emphasis added).

Steel relies on *Fedders* in seeking a refund of the CEMS purchase price. Doc. #97 at 25. However, not only does that case require a finding of worthlessness, it also held that it was "not unreasonable" for a seller to refuse to replace an "entire" malfunctioning heat pump—consisting of an outdoor condenser and an indoor evaporator—where there was evidence only that the outdoor unit was the cause of the heat pump's malfunctions. *Fedders*, 493 So. 2d at 309. Such is relevant here because, absent proof that defects in other CEMS components besides the DAS software caused

---

[28] Steel argues that the CEMS were worthless yet also admits—as Vogel testified—that it reused $23,340 in components from the Altech CEMS in new, operational CEMS. Doc. #97 at 25–26; Tr. at 311.

the CEMS malfunctions, it remains likely that a significant portion of the components constituting the CEMS retained value.

Thus, it is far from clear that the CEMS were worthless. For instance, if the CEMS' malfunctions were caused only by one defective component, crucial but inexpensive to replace, the units would have retained significant value. Though it is clear that the CEMS were unsuitable and insufficient for their specified purpose, Steel presented no evidence attempting to explain the cause of the analyzer malfunctions or the impact of the DAS computer malfunctions on the value of the CEMS. Such evidence is particularly important here because the CEMS are a combination of subsystems that can be reconfigured with other subsystems to achieve the same intended purpose.

Thus, under § 75-2-714(2), Steel failed to produce sufficient evidence showing a reasonably certain difference in value of the CEMS as accepted and as warranted; consequently, Steel cannot recover direct damages for Altech's breach of contractual warranty. *Gast*, 585 So. 2d at 731 ("[N]o recovery was permissible under § 75-2-714" where plaintiff "failed to submit requisite proof" of relevant difference in value).

### 2. Consequential and incidental damages

Section 75-2-714(3) provides for incidental and consequential damages under § 75-2-715 "in a proper case." Where, as here, an exclusive limited contractual remedy fails of its essential purpose, a subsequent action is a "proper case" for recovery of incidental and consequential damages. *See Mercury Marine*, 839 So. 2d at 528 ("Generally, if an express limited warranty provides the exclusive remedy, and that warranty fails of its essential purpose, the purchaser can then pursue the other remedies provided by the Code including consequential or incidental damages.").

### a. Consequential damages

As relevant here, consequential damages include "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know

and which could not reasonably be prevented by cover or otherwise." Miss. Code Ann. § 75-2-715(2)(a). In this case, Steel seeks two categories of consequential damages: the MDEQ fine and attorney's fees in dealing with MDEQ.

In calculating damages recoverable for a breach of contract, the plaintiff must "trace" the damages "directly to the breach of contract and make them definite enough to comply with the governing rules of law." *Ammons v. Wilson & Co.*, 170 So. 227, 229 (Miss. 1936). Regarding the MDEQ fine, Anna Chappell—Steel's testifying corporate representative—admitted that Steel has "no way of splitting up how much of the [MDEQ] penalty was for not having operational CEMS" and how much was for the other violations cited by MDEQ in levying the fine. Tr. at 250.

Steel argues that its attorney, Michael Caples—whom Steel retained to negotiate the MDEQ fine—testified that none of the other violations cited by MDEQ other than the one for failing to operate adequate CEMS would typically have resulted in fines. *Id.* at 363–65. Caples never so testified, and even if he had, such testimony would be insufficient to establish that the other violations could have had no effect on the overall fine amount in this case.[29] Instead, Caples testified that Steel self-reported several minor violations after MDEQ's Notice of Violation so that they would be included in the ultimate fine, thus "set[ting] the slate clean," suggesting that the other violations taken together could have been cause for adverse regulatory action. *Id.* at 328–29.

Nevertheless, Steel failed to prove the extent to which, in this case, MDEQ disregarded the other violations in assessing its fine. The Notice of Violation includes a violation for failing to report CEMS malfunctions; clearly such cannot be Altech's fault, which Steel concedes. *Id.* at 364. More significant, the item in the Notice of Violation for failing to report malfunctions quotes language

---

[29] Steel never designated Caples as an expert witness. To the extent Caples would have testified that, in his opinion, MDEQ did not consider such violations in choosing the fine amount in this case, such would be improper lay opinion. *United States v. Riddle*, 103 F.3d 423, 429 (5th Cir. 1997) (holding testimony of bank examiner asserting cause of bank failure and describing "how the [Office of the Comptroller of the Currency] viewed certain complex transactions" improper lay opinion where examiner not designated as expert).

from Steel's Title V permit that "if the permittee demonstrates through properly signed contemporaneous operating logs, or other relevant evidence" an operational "upset" of the CEMS and the proper response to such upset, "[t]he occurrence of an upset constitutes an affirmative defense to an enforcement action." Ex. P-12 (unnumbered at 13–14). Given this, even to the extent CEMS-related, the MDEQ fine may be traceable, at least in part, to *Steel's* omissions. Regardless, Steel cannot trace the MDEQ fine wholly or partially to Altech's breach in any reasonably certain amount; its damages claim for the MDEQ fine thus fails. Unable to attribute the MDEQ fine to Altech's breach, Steel is likewise unable to so attribute its attorney's fees in dealing with MDEQ, and its damages claim for such amount must also fail.

### b. Incidental damages

As relevant here, incidental damages include "any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."[30] Miss. Code Ann. § 75-2-715(1). Such damages "must be reasonably ascertainable and … the plaintiff cannot recover from losses he reasonably could have prevented." *Massey-Ferguson*, 406 So. 2d at 19. "An expense will not ordinarily be considered as an item of incidental … damage to a breach of warranty when the buyer would have incurred the claimed expense even if the product or goods had been as warranted." *Delhomme Indus.*, 735 F.2d at 185–86.

Initially, though Steel presented ample evidence that it purchased replacement CEMS, it presented no evidence of the cost of such replacement. Accordingly, Steel may not recover as incidental damages extra expenses incurred in effecting cover. That leaves only "any other reasonable expense incident to … breach." In this regard, Steel seeks $259,024.43 in such

---

[30] As described in § 75-2-712(1), "the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller."

damages.[31]  Doc. #97 at 8.  Altech disputes several invoices serving as the basis for this amount, arguing that Steel's maximum amount of claimed incidental damages relating to Altech's breach of warranty is $56,138.55.  Doc. #96 at 26.

Steel may recover the amount it paid to a third party to conduct emissions testing that would have been accomplished by the CEMS had they been delivered as warranted.  This amount includes only the cost of such testing on the two steel production lines in which an Altech CEMS was installed.  Steel was invoiced for seven such tests occurring when a CEMS should have been operational, at a cost of $2,100 per test of only the four regulated pollutants.  Ex. P-14 at 4899–905.  Accordingly, for third party emissions testing, Steel may recover $14,700.

Steel may recover the costs it incurred contracting with Contec and its vendor of replacement CEMS to investigate and attempt to remedy the malfunctions of the Altech CEMS.  For this, Steel may recover $30,513.89.  *Id.* at 4932–33, 4935–39; Tr. at 196, 199.  Finally, Steel may recover all the costs it paid to Altech to fund Altech's failed remedial efforts that Altech chose not to cover under warranty—$38,006.38.  Ex. P-14 at 4956–60, 4964–72, 4981–84.

Excluded from the damages computation are three invoices from Altech introduced into evidence by Steel:  one for training, another for extra monitors to go along with a replacement computer Altech provided under warranty, and a third for a "milestone payment."  *Id*. at 4962, 4974, 4983; Ex. P-8 at 25119.  Steel has not shown by a preponderance of the evidence that any of these invoices were defect-related or defect-caused.

Also excluded are $202 listed in one invoice for two micron filters, and $96 and $224 listed in another invoice for particulate and coalescing filters, respectively, which likely were either

---

[31] Steel seeks an additional fifty cents in its proposed findings and conclusions; however, this appears to reflect an arithmetic error.  Although Steel introduced several purchase orders among invoices of its claimed incidental expenses, Steel offered testimony that only a list of such invoices represents "CEMS expenses that Steel Dynamics paid above and beyond the initial purchase of the CEMS units."  Tr. at 194.

maintenance items or necessary because of the operating environment of Steel's plant and not because of CEMS defects. Ex. P-14 at 4966, 4981; Tr. at 572.

Further excluded are invoices for expenses related to housing the CEMS, including for insulation, refrigeration, a concrete pad, and wiring. The Altech proposal made clear that Steel was responsible for housing the CEMS in an air-conditioned room; moreover, much of these housing provisions were likely necessary for the replacement CEMS. Also excluded are invoices for calibration gases. Though CEMS malfunctions could result in wasted calibration gas, Steel admitted that it had connected bottles of calibration gas to the CEMS improperly, causing the bottles to leak. Tr. at 596–97. Moreover, it is beyond dispute that a properly working CEMS would consume calibration gas, and Steel presented no evidence as to how much calibration gas the CEMS would have consumed had they been delivered as warranted. Instead, Steel argued that even if it would have purchased all the invoiced calibration gas for working CEMS, its actual calibration gas expense was wasted because the Altech CEMS were never repaired. *Id.* at 682–83. But this argument misses the point, as Steel would still have had to buy calibration gas even if Altech never breached its contractual warranty.

**V**

**<u>Conclusion</u>**

In its amended complaint, Steel asserts claims for contractual indemnity, negligence, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and breach of contractual warranty. The contractual indemnity claim was dismissed with prejudice on Altech's ore tenus motion for judgment on partial findings at trial. For the reasons above, Altech's ore tenus motion for judgment on Steel's remaining claims is **GRANTED in Part and DENIED in Part**. The motion is GRANTED such that Steel's claims for negligence, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular

purpose are **DISMISSED with prejudice**; the motion is otherwise DENIED.  Steel is awarded

$83,320.27 on its contractual warranty claim.  A separate final judgment will issue.

     **SO ORDERED**, this 31st day of March, 2017.

                    **/s/ Debra M. Brown**                
                    **UNITED STATES DISTRICT JUDGE**